**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOSE ANTUNES,                                              CASE NO:

                  Plaintiff,                               HON.

v.

GERDAU MACSTEEL, INC.,
a Delaware corporation,


                  Defendant.

---

RAY CAREY (P33266)
GASIOREK, MORGAN, GRECO,
McCAULEY & KOTZIAN, P.C.
30500 Northwestern Highway
Suite 425
Farmington Hills, Michigan 48334
(248) 865-0001
rcarey@gmgmklaw.com

*Attorneys for Plaintiff*

---

**<u>COMPLAINT AND JURY DEMAND</u>**

    Plaintiff Jose Antunes, by and through his attorneys, GASIOREK,

MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., complains against Defendant

Gerdau MacSteel, Inc. ("Defendant"), as follows:

1.     This is an action for employment discrimination and interference in violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§621, *et seq.*; for employment discrimination and interference in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq.*; and retaliation in violation of Title VII arising out of Plaintiff's employment relationship with Defendant.

## PARTIES

2.     Plaintiff Jose Antunes (hereinafter "Plaintiff" or "Mr. Antunes") resides in the City of Dexter, in Washtenaw County, State of Michigan, within the Eastern District of Michigan.

3.     Defendant Gerdau MacSteel, Inc. (hereinafter "Defendant," "MacSteel" or "Defendant Gerdau MacSteel"), is incorporated in the State of Delaware and maintains its headquarters at 4221 W. Boy Scout Blvd., Ste. 600., Tampa, Florida 33607, but it also has offices and a place of business at 5591 Morrill Road, Jackson, Michigan 49201, and other locations within the Eastern District of Michigan.

4.     Plaintiff was at all relevant times co-employed by Gerdau S.A. and Defendant Gerdau MacSteel, most recently as Defendant Gerdau MacSteel's Accounting Manager until his employment was abruptly terminated on and effective, December 6, 2019.

2

## JURISDICTION AND VENUE

5.      The amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C.§1343 (civil rights); 29 U.S.C. §§621, *et seq*. (violation of the ADEA); and 42 U.S.C. §§ 2000e (violation of Title VII), *et seq*.

7.      This Court has personal jurisdiction over Defendant Gerdau MacSteel because the company maintains offices and facilities and engages in regular and systematic business and other activities within the Eastern District of Michigan and the acts attributed to Defendant that give rise to Plaintiff's claims occurred within the Eastern District of Michigan.

8.      Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 22, 2020, asserting that Defendant Gerdau MacSteel engaged in discrimination and interference against him on account of his age in violation of the ADEA when they did not select him for an Operations Strategic Controller position, terminated his employment, and did not provide him with other comparable Gerdau S.A., Ameristeel, and MacSteel job opportunities in lieu of employment termination; engaged in discrimination and interference against him on account of his

3

national origin, alienage, race, and gender in violation of Title VII with respect to his eligibility for salary increases and promotions and when they did not select him for an Operations Strategic Controller position, terminated his employment, and did not provide him with other comparable Gerdau S.A., Ameristeel, and MacSteel job opportunities in lieu of employment termination; and retaliated against him in violation of Title VII for complaints he made about pay discrimination when they did not select him for an Operations Strategic Controller position, terminated his employment, and did not provide him with other comparable Gerdau S.A., Ameristeel, and MacSteel job opportunities in lieu of employment termination.

9.     Plaintiff's Charge of Discrimination was filed within the 300-day period after December 6, 2019, when Defendant terminated his employment.

10.     The EEOC mailed Notice of Suit Rights to Plaintiff with respect to the above referenced Charge of Discrimination on February 24, 2020, which was received by Plaintiff on March 1, 2021, and Plaintiff is filing this complaint for disparate treatment discrimination and interference against him on account of his age in violation of the ADEA;  disparate treatment discrimination and interference against him on account of his  national origin, alienage, and gender in violation of the Title VII;  and retaliation against him in violation of Title VII within the requisite 90 day period after he received the notice.

4

11.    Venue is proper in this district court pursuant 28 U.S.C. §1391(b) and (c) because Plaintiff resides and Defendant is located within the Eastern District of Michigan and the events that give rise to Plaintiffs' claims occurred within the Eastern District of Michigan.

12.    Venue also is convenient in this judicial district.

## BACKGROUND FACTS

13.    Mr. Antunes was born on August 4, 1968, is a 53-year-old male citizen of Brazil, and is a person of Brazilian ancestry and national origin.

14.    Mr. Antunes is married to his long-time wife, Andreia, who is a citizen of Brazil and a person of Brazilian ancestry and national origin, and they have two minor children, one child who was born in Brazil and is a citizen of Brazil and another child who was born in the U.S.

15.    Mr. Antunes is a highly educated finance, audit, and accounting executive with over 25 years of experience working in these fields of expertise.

16.    Gerdau S.A. ("Gerdau") is a more than 100-year-old Brazilian steel company and purports to be the leading producing of long steel in North and South America and one of the major suppliers of specialty long steel throughout the world.

17.    Gerdau has its headquarters in Brazil, but it owns operating companies in at least 14 other countries, including the United States.

5

18.     Gerdau markets its products to the construction, metal-mechanical, automotive, heavy truck, agricultural, and other industrial sectors throughout the world.

19.     Gerdau's products in their diverse forms are an integral part of the structures of homes, commercial structures and office buildings, shopping centers, hospitals, bridges, manufacturing, assembly and hydroelectric plants; these are incorporated into power and telephone lines; and these are raw material for automotive and truck parts and construction and agricultural equipment.

20.     Defendant Gerdau MacSteel and Gerdau Ameristeel, Inc. ("Gerdau Ameristeel") are wholly owned U.S. subsidiaries of Gerdau.

21.     Gerdau was the majority owner of MacSteel Monroe, Inc., d/b/a Gerdau Special Steel North America, which merged into Defendant Gerdau MacSteel, effective December 31, 2015.

22.     Gerdau Ameristeel and Defendant Gerdau MacSteel are part of the special steel business operations of Gerdau.

23.     Defendant Gerdau MacSteel is an engineered steel bar producer which has an office in Jackson, Michigan, and operates steel mills in Jackson and Monroe, Michigan, and Fort Smith, Arkansas, and metal processing facilities in Huntington, Indiana.

24.     Mr. Antunes commenced his employment with Gerdau at its corporate offices in Brazil in November, 2003, as a Technical Advisor after working as an auditor for Price Waterhouse Coopers since June, 1991.

25.     As Mr. Antunes employer, Gerdau was required under the Labour and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Mr. Antunes and his family which included, but were not limited to: annual salary, health, and other benefits; funding of Brazilian social security benefits at the rate of between 8 and 11% of Mr. Antunes's total annual compensation; funding of a guaranteed severance fund ("FGTS") for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; 30 days plus 3 additional days per year of service   prior notice of employment termination without cause or pay in lieu of requisite notice; and upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement.

26.     These were deemed to be contractual terms and conditions of Mr. Antunes's employment with Gerdau whether or not incorporated into a written employment contract as a matter of Brazilian law.

27.     As a Technical Advisor for Gerdau, Mr. Antunes was responsible for and more than satisfactorily performed duties with respect to preparation of financial statements in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Accounting Principles in Brazil ("BR GAAP") and preparation of consolidated financial statements for review by Gerdau leadership and in accordance with U.S. and Brazilian security and exchange commission ("SEC") reporting standards.

28.     Mr. Antunes more than satisfactorily performed these various accounting, financial reporting and financial compliance functions for Gerdau until on or about November 1, 2006, when Gerdau transferred him as an expatriate to Gerdau Ameristeel in Tampa, Florida, as a Senior Corporate Accountant.

29.     Gerdau and Gerdau Ameristeel initially arranged for Mr. Antunes to obtain an L-1A nonimmigrant employment visa from the U.S. Citizenship and Immigrations Services ("USCIS") within the U.S. Department of Homeland Security authorizing him to work for Gerdau and Gerdau Ameristeel in the U.S.

30.     The L-1A nonimmigrant visa classification enables a U.S. employer like Gerdau Ameristeel to facilitate the transfer of an executive or manager from a foreign parent company like Gerdau to temporarily work in the U.S. for a 3-year period that may extended for a total period not to exceed 7 years.

31.     As a Senior Corporate Accountant at Gerdau Ameristeel, Mr. Antunes was co-employed by Gerdau and Gerdau Ameristeel  and he was responsible for and more than satisfactorily performed duties with respect to preparation of financial statements in accordance with GAAP, BR GAAP, and international financial reporting standards ("IFRS"); reporting financial and managerial information internally to Gerdau Ameristeel and to Gerdau leadership; preparation of monthly financial closing and reporting statements, routine financial journal entries, standard financial accruals, and financial allocations and statistics for Gerdau Ameristeel financial accounting and operational purposes; preparation of consolidated financial statements for review by Gerdau leadership and in accordance with SEC reporting standards; and coordination of audit operations and preparation of audit schedules for outside auditors.

32.     As co-employers of Mr. Antunes, Gerdau and Gerdau Ameristeel were required under the Labour and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Mr. Antunes and his

family which included, but were not limited to: annual salary, health, and other benefits; continued funding of Brazilian social security benefits at the rate of between 8 and 11% of Mr. Antunes's total annual compensation; continued funding of the FGTS guaranteed severance fund for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; 30 days plus 3 additional days per year of service prior notice of employment termination without cause or pay in lieu of requisite notice; upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement; housing subsidies; rental car allowances; moving allowances and/or transport of household goods to and from Brazil; round trip airfare, hotel and other housing and related expenses for Mr. Antunes and his family; airfare, moving expenses, and housing expenses upon return of Mr. Antunes and his family to Brazil; income tax assistance; and other benefits.

33.     These were deemed to be contractual terms and conditions of Mr. Antunes co-employment with Gerdau and Gerdau Ameristeel whether or not incorporated into a written employment contract as a matter of Brazilian law.

34.     Mr. Antunes more than satisfactorily performed his various accounting, financial reporting and financial compliance functions for Gerdau and Gerdau Ameristeel until on or about June 1, 2008, when Gerdau and Gerdau Ameristeel transferred him as an expatriate to Defendant Gerdau MacSteel in Jackson, Michigan, initially as its Financial Planning Manager and later as its Accounting Manager.

35.     Mr. Antunes received and accepted a May 7, 2008 written offer with respect to his MacSteel position.

36.     Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel arranged for Mr. Antunes to obtain an H-1B nonimmigrant employment visa and for renewals of this type of visa from the USCIS during the period between June, 2009, and January, 2014, while Mr. Antunes was employed at Defendant Gerdau MacSteel.

37.     The H-1B visa is a non-immigrant employment visa that allows U.S. companies like Gerdau Ameristeel and Defendant Gerdau MacSteel to temporarily employ foreign workers in specialty occupations that require theoretical or technical expertise in specialized fields such as in information

technology, finance, accounting, architecture, engineering, mathematics, science, medicine, and other professional fields.

38.    As Defendant Gerdau MacSteel's Financial Planning Manager and later as its Accounting Manager, Mr. Antunes was co-employed by Gerdau  and Defendant Gerdau MacSteel and he was responsible for and more than satisfactorily performed duties with respect to: preparation of financial statements in accordance with GAAP,BR GAAP, and IFRS; reporting financial and managerial information internally to Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Gerdau leadership; preparation of monthly financial closing and reporting statements, routine financial journal entries, standard financial accruals, and financial allocations and statistics for Defendant MacSteel financial accounting and operational purposes; preparation of consolidated financial statements for review by Gerdau leadership and in accordance with SEC reporting standards; coordination of audit operations and preparation of audit schedules for outside auditors; development and implementation of auditing, accounting, and financial reporting policies, practices and procedures, internal controls, and financial strategies to maintain the competitive positions of Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel; coordination of internal and external audits of Defendant Gerdau MacSteel and its various mills and other

operations; serving as the key liaison between the MacSteel operations and finance functions; consolidated financial and other management reporting to the Gerdau corporate team in Brazil; consolidated financial and other management reporting to Defendant Gerdau Ameristeel's finance and other management;  supervision of and collaboration with MacSteel mill controllers, accountants, and finance team; training and evaluation of Defendant Gerdau MacSteel accounting staff; and identification and remediation of adverse auditing, accounting, and financial issues arising within MacSteel mills and other operational units, among other duties.

39.   During his employment at Defendant MacSteel, Mr. Antunes was responsible for creation of its credit department, assumed responsibility for credit department, accounts receivable and payable, and payroll issues, and worked with Gerdau compliance representatives to develop and implement operational policies, practices and procedures for the credit department and accounts payable and payroll functions.

40.   As co-employers of Mr. Antunes, Gerdau and Defendant Gerdau MacSteel were required under the Labour and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Mr. Antunes and his family which included, but were not limited to: annual salary, health, and other benefits; continued funding of Brazilian social security benefits at the

13

rate of between 8 and 11% of Mr. Antunes's total annual compensation; continued funding of the FGTS guaranteed severance fund  for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement; housing subsidies; rental car allowances; moving allowances and/or transport of household goods to and from Brazil; round trip airfare, hotel and other housing and related expenses for Mr. Antunes and his family; airfare, moving expenses, and housing expenses upon return of Mr. Antunes and his family to Brazil; income tax assistance; and other benefits.

41.    These were deemed to be contractual terms and conditions of Mr. Antunes's co-employment with Gerdau and Defendant Gerdau MacSteel whether or not incorporated into a written employment contract as a matter of Brazilian law.

42.    Mr. Antunes initially reported to the MacSteel Vice President Group Controller as MacSteel's Financial Planning Manager and later reported to the

14

President of MacSteel as MacSteel's Financial Planning Manager and later as its Accounting Manager.

43.    Mr. Antunes received performance evaluations throughout the period of his employment in these roles, including the last evaluation that he received from MacSteel's then President for its 2018 fiscal year, evincing that he consistently met expectations for his positions.

44.    Although Mr. Antunes received performance evaluations throughout his MacSteel employment evincing that he consistently met expectations for his positions, he was paid less than a female who is a U.S. citizen and was employed by Defendant Gerdau MacSteel as a  plant controller at its Monroe plant and later as a regional Controller although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

45.    Gerdau and Defendant Gerdau MacSteel arranged for renewal of Mr. Antunes H-1B visa during the period between June, 2009, and January, 2014.

46.    However, Gerdau  and Defendant Gerdau MacSteel representatives had decided after Mr. Antunes's transfer to Gerdau MacSteel in June, 2008, and

while they were arranging for him to obtain an H-1B visa that he should obtain and arranged for him to obtain a Permanent Resident Card or Green Card so that Mr. Antunes could work on an indefinite basis in the U.S. for Gerdau and Defendant Gerdau MacSteel initially as Defendant Gerdau MacSteel's Financial Planning Manager and later as its Accounting Manager.

47.     The USCIS granted the petition filed on Mr. Antunes's behalf for and issued a Green Card to Mr. Antunes, effective January 1, 2014.

48.     Gerdau  and Defendant Gerdau MacSteel representatives' decision that Mr. Antunes should obtain and the arrangements they made for Mr. Antunes to obtain a Green Card actually occurred in conjunction with an illegal, malicious, and wrongful conspiracy among them and as a pretext to ostensibly, unilaterally terminate Mr. Antunes's express or implied employment contract and co-employer relationship with Gerdau  and Defendant Gerdau MacSteel once his status changed to Brazilian expatriate with U.S. Green Card status.

49.     Gerdau and Defendant Gerdau MacSteel representatives' decision that Mr. Antunes should obtain and the arrangements they made for Mr. Antunes to obtain a Green Card actually occurred in conjunction with an illegal, malicious, and wrongful conspiracy among them by which they purportedly would terminate Mr. Antunes's Gerdau employment relationship and seek to avoid Gerdau and Gerdau MacSteel's continuing obligations to respect and

guarantee rights and entitlements provided to Mr. Antunes as a Brazilian expatriate under the Constitution and Labour and other laws of Brazil.

50. Gerdau and Defendant Gerdau MacSteel representatives effectuated the purported unilateral termination Mr. Antunes's co-employment relationship with Gerdau and Defendant Gerdau MacSteel and Gerdau purported to permanently transfer Mr. Antunes to Defendant Gerdau MacSteel, effective April 1, 2014.

51. This occurred in violation of the Labour and other laws of Brazil, which provide that those aspects of Brazilian law that are more favorable to a Brazilian expatriate employee than the laws of the foreign county where he works continue to apply to the Brazilian expatriate employee.

52. Mr. Antunes told Mr. Mark Marccuci, Defendant Gerdau MacSteel's former President, during his 2018 performance review with Mr. Marccuci, that he believed that the job description and compensation for his position as Accounting Manager should be enhanced because these did not account for all the duties and responsibilities that he was performing.

53. Mr. Marccuci acknowledged that there should be adjustments to Mr. Antunes's job description and compensation to account for the duties and responsibilities that he was performing, but he never implemented any of these

17

changes because he decided that these determinations should be made by Gerdau representatives because of Mr. Antunes's Brazilian expatriate status.

54.     Gerdau replaced Mr. Marccuci with Mr. Rodrigo Belloc as President of MacSteel in June or July, 2019, and Gerdau, Defendant Gerdau MacSteel, and their representatives, including Mr. Belloc and the Gerdau MacSteel Human Resources Director, Andre Rodrigues, thereafter conspired to terminate Mr. Antunes employment because they intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

55.     Between the Summer and November, 2019, Mr. Antunes like certain other MacSteel employees was offered the opportunity to voluntarily terminate his MacSteel employment in consideration for certain severance benefits that the Company offered ("voluntary buy-out offer").

56.     Mr. Antunes declined to accept the voluntary buy-out offer.

57.     As a result, Messrs. Belloc and Rodrigues conspired with other Gerdau and Defendant Gerdau MacSteel representatives and initiated a scheme to involuntarily terminate Mr. Antunes's employment without cause, because of his age, alienage, national origin, and gender and because they intended to replace him with a younger, unqualified Brazilian who was to be transferred from Gerdau.

58.     Gerdau, Defendant Gerdau MacSteel, and their representatives, including Messrs. Belloc and Rodrigues, decided in accordance with this conspiracy to post and purportedly implement a selection process for the position of MacSteel Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified.

59.     Messrs. Belloc and Rodrigues interviewed Mr. Antunes in late November, 2019, under the pretense that he was being given fair consideration for the position.

60.     During the interview, Mr. Antunes complained that he had been unfairly compensated and denied salary increases and promotions throughout his Macsteel employment when he assumed additional responsibilities while female and other coworkers who were U.S. citizens received salary increases and promotions when they assumed additional responsibilities, and he asked if Mr. Belloc was going to "fire" him or otherwise terminate his employment.

61.     During the interview, Mr. Antunes's did not expressly accuse Defendant Gerdau MacSteel of pay and promotion discrimination against him based on his sex and national origin, but Messrs. Belloc and Rodrigues understood and reasonably should have understood from the context that Mr. Antunes was complaining about unlawful pay and promotion discrimination against him by Defendant Gerdau MacSteel based on his sex and national origin.

62.    Mr. Belloc falsely responded "No" to Mr. Antunes's question about whether Mr. Belloc intended to fire him although he had decided to reject Mr. Antunes for the Operations Strategic Controller position and to terminate Mr. Antunes's employment because of Mr. Antunes's complaints that he had been unfairly compensated and denied salary increases and promotions throughout his Macsteel employment, because of his age, and because he intended to select a younger, unqualified Brazilian expatriate for the position and as Mr. Antunes's replacement.

63.    Messrs. Belloc and Rodrigues interviewed two other Gerdau MacSteel employees who were older than age 50 during November, 2019, under the pretense that they also were being given fair consideration for the position, but they also were not selected because Mr. Belloc had decided to select a younger, unqualified Brazilian expatriate for the position and as Mr. Antunes's replacement.

64.    Messrs. Belloc and Rodrigues later notified Mr. Antunes that he had not been selected for the Operations Strategic Controller position although Mr. Antunes's was not only amply qualified for it, he also was the most qualified candidate for the position, and they did not articulate how or why he was deemed unqualified for the position.

20

65. The interview process for the MacSteel Operations Strategic Controller position was a sham and Mr. Antunes was not selected for the position because of Mr. Antunes's complaints that he had been unfairly compensated and denied salary increases and promotions throughout his Macsteel employment, because of his age, and because Mr. Belloc had decided to select a younger, unqualified Brazilian expatriate for the position and as Mr. Antunes's replacement.

66. The interview process for the MacSteel Operations Strategic Controller position was a sham and Mr. Antunes was not selected for the position because these actions occurred in conjunction with an illegal, malicious, and wrongful conspiracy among Gerdau, Defendant Gerdau MacSteel, and their representatives to terminate Mr. Antunes's employment without cause, because of his age, for pretextual reasons since they already had selected a younger, unqualified Brazilian who was to be transferred from Gerdau to MacSteel for the position and as a replacement for Mr. Antunes, and because of Mr. Antunes's complaints that he had been unfairly compensated and denied salary increases and promotions because of his sex and national origin.

67. Mr. Antunes was not given any notice of job performance deficiencies for which he was culpable, warnings of any kind about his job

21

performance, or subjected to discipline of any kind, a correction action or performance improvement plan of any kind, or another performance evaluation at any time before December 6, 2019.

68.   Neither Mr. Antunes nor anyone else in the departments he managed received notice at any time before December 6, 2019, that MacSteel intended to eliminate Mr. Antunes's job or any other jobs within the departments managed by him or in the Gerdau Jackson offices.

69.   On December 6, 2019, less than two weeks after Mr. Antunes was interviewed for the MacSteel Operations Strategic Controller position, Mr. Belloc met with Mr. Antunes and abruptly told him that his co-employment with Gerdau and Defendant Gerdau MacSteel was terminated ostensibly because his job had been eliminated, effective December 6, 2019, and he did not provide him with other available Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities.

70.  Mr. Belloc falsely stated that Mr. Antunes's job had been eliminated although Mr. Belloc previously had falsely told Mr. Antunes that his job was not in jeopardy; he had decided to terminate Mr. Antunes's employment because of his age and his complaints that he was unfairly compensated and denied salary increases and promotions because of his sex and national origin; the duties and responsibilities of his position had not been eliminated and these needed to be

22

performed; and Mr. Belloc had selected a younger, unqualified Brazilian expatriate who was to be transferred from Gerdau for the Operations Strategic Controller position and as Mr. Antunes's replacement.

71.     Job elimination does not constitute a termination of employment for "cause" as defined in the Brazilian Labour laws and statutes.

72.     Despite this, Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did not offer to pay to Mr. Antunes and did not pay to him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Mr. Antunes upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for  airfare, moving expenses, and housing expenses to enable Mr. Antunes and his family to move back to Brazil; among other benefits.

73.     Instead, Mr. Antunes was given a copy of a proposed Separation Agreement and Full and Final Release of Claims (severance agreement).

74.     The proposed severance agreement included an offer of 16 weeks of base pay, payment of the amount that Defendant Gerdau MacSteel would have contributed toward the costs of medical, prescription, dental and vision

benefits that Mr. Antunes had with the Company for the 16 week period, and the Short term Incentive payment that he should have earned but for the wrongful, discriminatory and retaliatory termination of his employment as consideration for Mr. Antunes's execution of the proposed severance agreement and release of all claims that arise out of Mr. Antunes's employment and employment relationships with Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel.

75.    Defendant Gerdau MacSteel and its representatives did not enhance Mr. Antunes's compensation to account for his actual duties and responsibilities because of his national origin and sex.

76.    Defendant Gerdau MacSteel and its representatives did not select Mr. Antunes for the position of MacSteel Operations Strategic Controller, concomitantly terminated Mr. Antunes's employment, and did not provide him with other available, comparable Gerdau,  Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities because of his age and in retaliation for the complaints he made during his interview for the Operations Strategic Controller position that he was unfairly compensated and denied salary increases and promotions because of his sex and national origin.

77.    Gerdau  and Defendant Gerdau MacSteel and their representatives treated Mr. Antunes differently than similarly situated non-Brazilian, younger,

and female employees and employees who are U.S. citizens who have consistently meets expectations or worse job evaluations when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Operations Strategic Controller; when they concomitantly terminated Mr. Antunes's employment; and when they did not provide him with other comparable Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities.

78.    Gerdau, Defendant Gerdau MacSteel, and their representatives sought to have Mr. Antunes sign the proposed severance agreement in an attempt to avoid accountability for their refusal to enhance Mr. Antunes's compensation to account for his actual duties and responsibilities; their selection of an unqualified, younger Brazilian expatriate for the MacSteel Operations Strategic Controller position and as Mr. Antunes's replace; and the concomitant termination of Mr. Antunes's employment.

79.    Defendants' purported reasons for the failure to enhance Mr. Antunes's compensation to account for his actual duties and responsibilities are not true and are a pre-text for discrimination against him on account of his national origin and sex.

80.    Defendants' purported reasons for the refusal to select Mr. Antunes for the position of MacSteel Operations Strategic Controller; the concomitant

termination of Mr. Antunes's employment; and the refusal to provide him with other comparable Gerdau job opportunities are not true and are a pre-text for discrimination against him on account of his age and for retaliation against him because of the complaints he made during his interview for the Operations Strategic Controller position that he was unfairly compensated and denied salary increases and promotions because of his sex  and national origin.

81.    As a consequence of the wrongful, discriminatory, and retaliatory termination of Mr. Antunes's co-employment with Gerdau and Defendant Gerdau MacSteel, Mr. Antunes and his family were effectively forced to live in exile in the U.S.  with no source of income between December, 2019, and May, 2020, and with limited if any comparable job opportunities available to Mr. Antunes since December, 2019, due to language limitations and other barriers to comparable re-employment.

## COUNT I – VIOLATION OF THE ADEA – AGE DISCRIMINATION

82.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

83.     At all times relevant, Plaintiff was an employee covered by and within the meaning of 29 U.S.C. §630 (f) and Defendant Gerdau MacSteel was his employer covered by and within the meaning of 29 U.S.C. §630 (b).

84.     At all times relevant, Defendant Gerdau MacSteel was a "person" as this term is defined by 29 U.S.C. §630 (a) and Messrs. Belloc and Rodrigues were agents of Defendant Gerdau MacSteel with respect to the selection of the candidate for the Operations Strategic Controller position and to terms and conditions of and the termination of Plaintiff's former Gerdau MacSteel employment.

85.     At all times relevant herein, under the ADEA and 29 U.S.C. § 623, Plaintiff had a right to employment with Defendant Gerdau MacSteel free from discrimination against him and interference with his rights based on his age.

86.      Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ADEA.

87.     Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ADEA when they did not select

him for the position of MacSteel Operations Strategic Controller and concomitantly terminated his employment and when they did not provide him with other comparable Gerdau, Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities.

88.     The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities.

89.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT II – VIOLATION OF Title VII
## – SEX DISCRIMINATION

90.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

91.     At all times relevant, Plaintiff was an employee covered by and within the meaning of 42 U.S.C. §§ 2000e(f) and Defendant Gerdau MacSteel was his employer covered by and within the meaning of 42 U.S.C. §2000e (b).

92.     At all times relevant, Defendant Gerdau MacSteel was a "person" as this term is defined by 42 U.S.C. §2000e (a) with respect to the terms and conditions of Plaintiff's former Gerdau MacSteel employment.

93.     At all times relevant herein, under Title VII and 42 U.S.C. § 2000e-2(a), Plaintiff had a right to employment with Defendant Gerdau MacSteel free from discrimination against him and interference with his rights based on his sex.

94.     Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under Title VII.

95.     Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex

29

and depriving Plaintiff of his rights under Title VII when they paid him less than the American female plant and later regional controller although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

96.    Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under Title VII when they did not enhance his compensation to account for his actual duties and responsibilities.

97.    The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities.

98.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary

30

pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT III – VIOLATION OF Title VII
## – NATIONAL ORIGIN DISCRIMINATION

99.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

100.   At all times relevant, Plaintiff was an employee covered by and within the meaning of 42 U.S.C. §§ 2000e(f) and Defendant Gerdau MacSteel was his employer covered by and within the meaning of 42 U.S.C. §2000e (b).

101.   At all times relevant, Defendant Gerdau MacSteel was a "person" as this term is defined by 42 U.S.C. §2000e (a) with respect to the terms and conditions of Plaintiff's former Gerdau MacSteel employment.

102.   At all times relevant herein, under Title VII and 42 U.S.C. § 2000e-2(a), Plaintiff had a right to employment with Defendant Gerdau MacSteel free from discrimination against him and interference with his rights based on his national origin.

103.   Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and

for the illegal purpose of discriminating against Plaintiff on account of his national and depriving Plaintiff of his rights under Title VII.

104.    Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and depriving Plaintiff of his rights under Title VII when they paid him less than the American female plant and later regional controller although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

105.   Defendant Gerdau MacSteel through its representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and depriving Plaintiff of his rights under Title VII when they did not enhance his compensation to account for his actual duties and responsibilities.

106.     The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities.

107.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

### COUNT IV – VIOLATION OF THE
### TITLE VII – RETALIATION/INTERFERENCE

108.   Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

109.   At all times relevant, Plaintiff was an employee covered by and within the meaning of 42 U.S.C. §§ 2000e(f) and Defendant Gerdau MacSteel was his employer covered by and within the meaning of 42 U.S.C. §2000e (b).

33

110.   At all times relevant, Defendant Gerdau MacSteel was a "person" as this term is defined by 42 U.S.C. §2000e (a) and Belloc and Rodrigues were agents of Defendant Gerdau MacSteel with respect to the terms and conditions of and the termination of Plaintiff's former Gerdau MacSteel employment.

111.   At all times relevant herein, under Title VII and 42 U.S.C. § 2000e-3(a), Plaintiff had a right to employment with Defendant Gerdau MacSteel free from retaliation, discrimination or interference because he opposed a violation of Title VII.

112.   Plaintiff opposed a violation of Title VII during his interview with Messrs. Belloc and Rodrigues on November 25, 2019, when he complained that he was unfairly compensated and denied salary increases and promotions.

113.   Although Plaintiff did not expressly accuse Defendant Gerdau MacSteel of pay and promotion discrimination against him based on his sex and national origin, Messrs. Belloc and Rodrigues understood and reasonably should have understood from the context that Plaintiff was complaining about unlawful pay and promotion discrimination against him by Defendant Gerdau MacSteel based on his sex and national origin.

114.   Defendant Gerdau MacSteel through its representatives, Messrs. Belloc and Rodrigues, illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of retaliating against Plaintiff

because he opposed violations of Title VII when they did not select him for the position of MacSteel Operations Strategic Controller and concomitantly terminated his employment.

115.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Jose Antunes respectfully requests that this Honorable Court grant the following remedies:

a.      Declare that the aforementioned practices and actions of Defendants are unlawful;

b.      Declare that Defendant's acts and practices outlined above are in violation of the ADEA and Title VII;

c.      Enjoin and permanently restrain these practices;

d.      Direct Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

e.      Award Plaintiff all lost past, present and future salary, bonuses, and incentive compensation, and benefits to which he had been entitled or should have been entitled as a Gerdau MacSteel employee, benefits to which he is entitled under the Labour and other laws of Brazil, and the value of all lost past, present and future employee healthcare, retirement, 401(K), and other benefits to which he had been entitled as a Gerdau MacSteel employee;

f.      Award Plaintiff liquidated damages for Defendant's violations of the ADEA;

g.      Award Plaintiff compensatory and punitive damages for Defendants' violations of the ADEA and Title VII;

h.      Award Plaintiff compensatory damages for mental anguish, emotional distress, humiliation and injury to his reputation;

i.      Award Plaintiff punitive and/or exemplary damages;

j.      Award Plaintiff's reasonable attorney fees and costs, including expert witness fees; and

k.      Grant such other legal or equitable relief as this Court deems appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff Jose Antunes, by his attorneys, GASIOREK, MORGAN, GRECO, MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO,
MCCAULEY & KOTZIAN, P.C.**

BY:     /s/Ray Carey
Raymond J. Carey (P33266)
Attorney for Plaintiff
30500 Northwestern Hwy, Ste. 425
Farmington Hills, MI 48334
(248) 865-0001
rcarey@gmgmklaw.com

Date:  May 12, 2021